**ROYAL THAI GOVERNMENT, TTU Industrial Corp., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 92–03–00175.

United States Court
of International Trade.

June 7, 1993.

Willkie Farr & Gallagher, Kenneth J. Pierce and Daniel L. Porter, Washington, DC, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Civil Div., Commercial Litigation Branch, U.S. Dept. of Justice, Michelle Behaylo, Attorney–Advisor, Office of the Chief Counsel for Import Admin., Dept., of Commerce, Michael S. Kane, Attorney, Washington, DC, for defendant.

### Memorandum Opinion and Order

NEWMAN, Senior Judge:

### INTRODUCTION

This action was brought by the Royal Thai Government ("RTG") and TTU Industrial Corp. under 19 U.S.C. § 1516a(a)(2)(B)(iii) to challenge the final results of the administrative review in *Carbon Steel Butt–Weld Pipe Fittings from Thailand: Final Results of Countervailing Duty Review*, 57 Fed.Reg. 5,248 (February 13, 1992) ("*Butt–Weld Review*"). In the final results, the International Trade Administration of the Department of Commerce ("Commerce") used a new methodology for computing a nationwide benchmark for short-term interest rates that it had recently adopted in *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Steel Wire Rope from Thailand*, 56 Fed.Reg. 46,299 (September 11, 1991) ("*Steel Wire Rope*"). Commerce did not, however, include any relevant evidence from the *Steel Wire Rope* investigation in the record of *Butt–Weld Review*.

Plaintiffs move for judgment on the agency record, remanding with instructions to calculate short-term rates under the methodology used in prior Thai subsidy cases. Commerce seeks a remand without instructions from the court, so that it may include the relevant documents from *Steel Wire Rope* in the instant record for ultimate judicial review.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

### BACKGROUND

This matter concerns an administrative review of a countervailing duty order pursuant to section 751(a) of the Tariff Act of 1930, 19 U.S.C. § 1675(a) (1988). The following is a brief summary of the genesis of this case.

On January 18, 1990 Commerce published the final results of a countervailing duty investigation in *Carbon Steel Butt–Weld Pipe Fittings from Thailand*, 55 Fed.Reg. 1,695 (January 18, 1990). In the investigation, Commerce determined that exporters of butt-weld pipe fittings enjoyed countervailable benefits from the Thai government in the form of low interest short-term loans under the Export Packing Credits ("EPC") program. *Id.* at 1,697. Specifically, the countervailable benefit consists of the difference between the interest rates charged for EPC loans and the rates generally available for short-term commercial lending in Thailand.

In order to arrive at a representative measure of short-term interest rates, Commerce ordinarily uses the predominant source of

short-term credit in the country of exportation as a "benchmark," which is then measured against the rates on the subsidized loan to determine the amount of the subsidy. Since there is no such predominant source in Thailand, Commerce has previously relied upon a benchmark that is calculated as the weighted average of the rates charged on domestic loans, bills and overdrafts ("RTG benchmark"). Benchmark rates are calculated by dividing the total interest actually paid on bills, loans and overdrafts by the total amount of bills, loans and overdrafts outstanding. Interbank loans, preferential government loans and foreign currency were excluded from the calculation. The underlying statistics used in calculating the RTG benchmark are provided by commercial banks to the Bank of Thailand. Commerce has established a precedent of using this benchmark in a long line of prior investigations and reviews, including the instant case.[1]

On February 19, 1991 Commerce initiated an administrative review of the *Butt–Weld Pipe Order* at the request of the United States Butt–Weld Pipe Fittings Committee for the period of November 3, 1989 through December 31, 1990. 56 Fed.Reg. 6,621 (February 19, 1991). Contemporaneously with this review, Commerce was conducting its countervailing duty investigation of steel wire rope from Thailand. *Steel Wire Rope, supra.* In the preliminary determination in *Steel Wire Rope,* Commerce continued to apply the RTG benchmark. *See id.* Moreover, Commerce's questionnaire in the *Butt–Weld Review* apparently contemplated the continued use of that benchmark. Countervailing Duty Questionnaire at 2, para "E," Plaintiff's App. at 33.

However, in the final results in *Steel Wire Rope,* which followed the initiation of both investigations, Commerce discontinued its previous reliance upon the weighted-average

RTG benchmark methodology and adopted as a new benchmark the unweighted average of the "prime" minimum loan and minimum overdraft rates reported in the Bank of Thailand Quarterly Bulletin (the "MLR/MOR benchmark"). The basis of the change in methodology seems to be a statement that was made during the on-site verification in *Steel Wire Rope* by an official at a large commercial bank in Bangkok. According to Commerce, the official stated that "most of the bank's short-term loans were made at these [MLR/MOR] rates," 56 Fed.Reg. at 46,299, and for this reason Commerce considers the MLR/MOR average to be more representative of short-term financing in Thailand than the benchmark supplied by the Bank of Thailand.[2] The average of the minimum loan rate and the minimum overdraft rate results in a higher benchmark interest rate than the RTG figure, thus yielding a higher subsidy valuation under the EPC program.

Following the results in *Steel Wire Rope,* plaintiffs here anticipated the possibility that Commerce might also abandon the RTG benchmark in the *Butt–Weld Review* because short-term interest rates are established on a country-wide basis. In response to an outstanding request for information from Commerce, plaintiffs submitted information on September 27, 1991 from the Bank of Thailand's Quarterly Bulletin and argued in an accompanying letter that Commerce's adoption of the MLR/MOR benchmark methodology in *Steel Wire Rope* "ignored actual commercial borrowers' experience in Thailand, which ... often involves short-term loans at rates below MLR and MOR rates." Letter of Kenneth J. Pierce, Esq., to Robert Mosbacher, Secretary of Commerce, at 2. Essentially, plaintiffs urged Commerce to resume use of the RTG benchmark. *Id.*

---

1. *See, e.g., Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 56 Fed.Reg. 29,222, 29,223 (October 9, 1991); *Steel Weld–Pipe Fittings from Thailand,* 55 Fed.Reg. 1695 (January 18, 1990); *Ball Bearings from Thailand,* 54 Fed.Reg. 19,130 (May 3, 1989); *Malleable Cast Iron Pipe Fittings from Thailand,* 54 Fed.Reg. 6,439, 6,440 (February 10, 1989); *Steel Wire Nails from Thailand,* 52 Fed.Reg. 36,987, 36,988 (October 2, 1987); *Certain Apparel from Thailand,* 50 Fed.Reg. 9,818,

9,819 (March 12, 1985) (RTG benchmark first used).

2. In *Steel Wire Rope,* Commerce noted that it could not obtain interest rate information for bills during the relevant review period in that investigation. It is unclear to what extent, if any, the availability of such information factored into Commerce's decision in the *Butt–Weld Review.*

On October 25, 1991 Commerce issued *Carbon Steel Butt–Weld Pipe Fittings from Thailand: Preliminary Results of Countervailing Duty Administrative Review*, 56 Fed.Reg. 55,283 (October 25, 1991). As plaintiffs anticipated, Commerce did not calculate the subsidy element by comparing EPC program rates to the old RTG benchmark. Instead, Commerce used the MLR/MOR methodology that it had adopted in *Steel Wire Rope*. Commerce determined that the benchmark for 1989 would be the average of the 1989 minimum loan rate and minimum overdraft rate which was 12.23 percent, resulting in a total bounty or grant from the EPC program during the period of November 3, 1989 through December 31, 1989 of 0.51 percent *ad valorem*. 56 Fed. Reg. at 55,284–285. The corresponding benchmark interest rate for the period of January 1, 1990 through December 31, 1990 was found to be 14.60 percent, resulting in a total bounty or grant from EPC loans valued at 0.23 percent *ad valorem*. *Id.*

Plaintiffs argued in their administrative case brief challenging Commerce's preliminary determination that the RTG benchmark was more representative of commercial lending than the MLR/MOR benchmark because the former accounts for 90 percent of commercial lending in Thailand, as opposed to overdrafts and loans which account for only 70 percent of lending. Furthermore, plaintiffs repeated the argument they had first raised in their letter to Secretary Mosbacher and offered a statement by the Bank of Thailand that much of commercial lending, including domestic loans and overdrafts, is actually conducted below the "prime" loan and overdraft rates published in the quarterly bulletin. Case brief at 7. Plaintiffs additionally cited earlier Commerce investigations in which the lower-than-prime rates had been charged to preferred customers. *Id.* at 6, 7, n. 10, 11. The logical conclusion

of plaintiff's argument was, and is, that although overdrafts and loans account for 70 percent of short-term commercial lending, the average of overdraft and loan rates as they appear in the Bank of Thailand Quarterly Bulletin is not an economically realistic benchmark against which the EPC program should be measured.[3]

Commerce did not respond to these arguments in any detail. Rather, Commerce tersely adopted the MLR/MOR benchmark by cross-reference to *Steel Wire Rope*, stating, in relevant part:

> Respondents submitted no evidence on the record of this review to refute ... [the *Steel Wire Rope*] determination.... [A]bsent new evidence that the MLR and MOR rates are not more representative of short-term rates during 1990 than the [RTG] benchmark ..., we have used an average of [the overdraft and loan] rates during 1990 as the benchmark interest rate for calculating the benefit from EPC's on which interest was paid in 1990.

*Butt–Weld Review*, 57 Fed.Reg. at 5249.

Commerce did not articulate why the average of minimum loan and overdraft rates was more representative than the RTG benchmark. Nor did Commerce place on the record any portions of the record in *Steel Wire Rope* that were before the agency during the instant review and in consideration of which it selected the *Steel Wire Rope* benchmark. Nor, finally, did Commerce even identify the evidence then on record in the *Butt–Weld Review* that supported its determination.

## DISCUSSION

■ The parties are in agreement that Commerce's selection of the MLR/MOR benchmark is unsupported by evidence in the current record, and that the record does not adequately explain how Commerce arrived at its determination. The court concurs, and

---

**3.** Plaintiffs maintain that the published minimum loan rate cannot be viewed in isolation, but is merely an expression by commercial banks to the Bank of Thailand of their prospective lending rates. Hence, plaintiffs' argument posits that the banks necessarily "high-ball" the minimum loan rate in advance because a Bank of Thailand regulation prohibits them from charging above that rate for certain types of lending. To sub-

stantiate their contention, plaintiffs cite evidence that would tend to show commercial lending at rates below the "prime" loan rate. For this reason, plaintiffs urge that Commerce incorrectly determined that the "prime" loan-rate (and overdraft rate) are representative of commercial borrowing in Thailand. Plaintiff's Brief at 19–20. Since the case is to be remanded, the court does not here reach the merits of that argument.

perceives in particular that the agency has not supplied a rational connection between any facts in the record and its decision that the average of the "prime" rate figures for minimum loan rates and minimum overdraft rates are to be considered representative of short-term commercial borrowing in Thailand. It is also unclear whether Commerce either chose to reject plaintiffs' submission that those rates are ceilings rather than rates actually charged on loans and overdrafts, or whether Commerce even took that argument into consideration. In either event, since the record is manifestly inadequate, the court must necessarily find the final results of the current administrative review to be unsupported by substantial evidence and therefore, not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

■ At this juncture, the court is asked to choose between two remedies. On the one hand, defendant moves to remand this action to permit Commerce to fill in the gaps with its evidence and analysis from *Steel Wire Rope,* thus rehabilitating the record and, presumably, justifying its action in the instant case. Conversely, plaintiff urges that the correct remedy is to reverse Commerce altogether and force a determination based upon the present state of the record. *See Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 135, 744 F.2d 1556, 1561 (Fed.Cir.1984) (where evidence is insubstantial, reviewing court must either reverse or remand for further fact finding). For the reasons that follow, the court determines that an outright reversal would be inappropriate at this time and remands the case for further proceedings consistent with this opinion.

Obviously, the agency committed a significant procedural error in this case. Nevertheless, the record does disclose that Commerce based its benchmark methodology upon *some* evidence. Commerce's explicit reference to *Steel Wire Rope* in the final results of the *Butt Weld Review,* 56 Fed.Reg. at 55,284, suggests that, given the opportunity to reopen the record for further development and explanation, Commerce might be in a position to show a logical connection between the evidence in *Steel Wire Rope* and its adoption of the MLR/MOR methodology.

Because that evidence is currently absent from the record, the court is unable at this point to conduct an informed judicial review of Commerce's decision.

The preferred course in such a case is to remand for further action by the agency. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). The question remaining is whether on remand Commerce may include in the record certain documents it failed to submit during the administrative review.

Plaintiffs concede that the record is not limited to information submitted to Commerce by interested parties in the *Butt–Weld Review.* The relevant *Steel Wire Rope* evidence is not barred from the record merely because it was obtained in a separate investigation. *Intrepid v. International Trade Admin.,* 16 CIT ——, 787 F.Supp. 227, 229 (1992). Rather, plaintiffs argue that Commerce may not use the *Steel Wire Rope* record in this case because it has not shown a necessary relationship between that evidence and the facts and arguments developed in the record during the *Butt–Weld Review. See Ipsco, Inc. v. United States,* 12 CIT 1128, 1132–1133, 701 F.Supp. 236, 240–41 (1988), *aff'd in part,* 899 F.2d 1192 (Fed.Cir.1990). The court rejects plaintiffs argument.

■ Both the *Steel Wire Rope* investigation and the *Butt–Weld Review* concerned the countervailable benefits from the EPC loan program. Moreover, short-term interest rates are determined on a nation-wide basis. In view of the commonality of issues that exists between *Steel Wire Rope* and the *Butt–Weld Review,* the relevance of the *Steel Wire Rope* evidence to the instant case is not seriously in question. The court is, therefore, reasonably satisfied that the documents obtained in *Steel Wire Rope* are sufficiently intertwined with the inquiry in *Butt–Weld Review* to justify their inclusion in the record on a remand. *See Floral Trade Council of Davis, Cal. v. United States,* 13 CIT 242, 242–43, 709 F.Supp. 229, 230 (1989).

■ Plaintiffs further advance the objection that a remand would only serve to allow Commerce to contrive new grounds to sus-

tain its action after the fact, whereas its initial determination was based upon a different rationale, unsupported by substantial evidence. Plaintiffs insist that consideration of the *Steel Wire Rope* evidence on remand would be tantamount to a *post hoc* justification of the sort condemned in *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1572 (Fed.Cir.1990) (*citing S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (agency action may not be sustained via judicial review under a rationale different from the one articulated at agency level)). *See also, Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419–20, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971). Here too, the court disagrees with plaintiffs contention.

Initially, it is clear from their submission of September 27, 1991 that plaintiffs had examined the record in *Steel Wire Rope* and were on notice that the RTG benchmark would likely be abandoned in the *Butt Weld Review* in favor of the new MLR/MOR benchmark. Plaintiffs were aware that information obtained during on-site verification in *Steel Wire Rope* formed the basis for Commerce's decision; this was also confirmed in the final results, 56 Fed.Reg. at 46,299. *Cf. Alhambra Foundry v. United States*, 9 CIT 632, 640–41, 626 F.Supp. 402, 411 (1985) (verification report added to record after final results not *post hoc* justification where information in report was compiled prior to final determination).

■ Second, defendant's motion for remand indicates that the statement(s) made during the verification proceedings in *Steel Wire Rope* formed the basis for the change in benchmark methodology. Defendant's Response at 4, n. 5. Accordingly, Commerce will be afforded the opportunity to present all the facts and evidence that informed its decision. *See PPG Industries, Inc. v. United States*, 13 CIT 183, 189, 708 F.Supp. 1327, 1331 (1989).

The court is fully aware of the inefficiency and delay that result when final judicial review is postponed until after the agency accomplishes on remand that which it should have accomplished in the period prescribed for the administrative review. However, balanced against the interest in efficient and expeditious administrative reviews is the equally compelling interest in accurate fact-finding. *See, e.g., Chung Ling Co., Ltd. v. United States*, 16 CIT ——, 805 F.Supp. 56, 67 (1992); *Borlem S.A.—Empreedimentos Industriais v. United States*, 13 CIT 231, 234, 710 F.Supp. 797, 799, 13 CIT 535, 544, 718 F.Supp. 41, 48 (1989) (remand authority under 28 U.S.C. § 2643(c)(1) is broad and serves to further interest of accurate agency determinations). Since defendant does not state an intention to conduct additional investigation, and proposes only to supplement the instant record with the evidence and analysis already contained in the record of *Steel Wire Rope*, the scope of the remand will be appropriately limited to the accomplishment of that purpose. On remand, all interested parties will be afforded a full opportunity to examine and comment on the *Steel Wire Rope* evidence that Commerce proposes to present, and to include for the record on remand any information that such interested parties may wish to offer in rebuttal. *See PPG Industries*, 13 CIT at 190–91, 708 F.Supp. at 1332–33; *Roquette Freres v. United States*, 6 CIT 42, 43, 1983 WL 2218 (1983) (agency to consider relevant information in its possession or which "hereafter may be presented to it").

### ORDER

Commerce's determination is unsupported by substantial evidence in the current record. This matter is remanded to Commerce for action consistent with the scope of the following remand order:

Commerce is ORDERED to submit for inclusion in the record those portions from the administrative record in *Steel Wire Rope* that it relied upon in its selection of the new MLR/MOR benchmark methodology. Such documents are to be submitted within 30 days of the date of issuance of this order. It is further

ORDERED that Commerce must determine within 30 days thereafter, on the basis of the above evidence from *Steel Wire Rope* and such information which plaintiffs may present in rebuttal, whether to affirm or modify its prior determination. If Com-

merce affirms that determination, it must identify what evidence in the appropriately supplemented record it relied upon in support of its conclusion that the unweighted average of MLR and MOR rates published in the Bank of Thailand Quarterly Bulletin accurately represents short-term commercial borrowing in Thailand, and how that evidence justifies its abandonment of the RTG weighted-average benchmark in favor of the MLR/MOR benchmark. Commerce is additionally directed to explain its determination in the light of loans and overdrafts below the "prime" rates. It is further

ORDERED that Commerce will report the results of the remand proceedings to the court no later than 60 days from the date of this order.

SO ORDERED.